trial, nor was the case disposed of upon any defect of proof in that respect. On the contrary, what was deemed to be sufficient proof was furnished; and if the plaintiff inopportunely stopped, as the defendant contends, it was undoubtedly because the fact as to the relations of the predecessor and successor company were assumed by both sides. It is a little late, and hardly fair, to raise this technicality now.

There is another question which will arise upon the new trial, and which should now be considered. The learned counsel for the appellant has suggested that the plaintiff might be entitled to 5 per cent. of the value of the business taken in exchange for 25 per cent. of the stock. We do not think that this would be the relief to which he is entitled. To so hold would interpolate into the contract something which is not there. The contract awards the plaintiff 5 per cent. of the defendant's 35 per cent. of stock. As plaintiff's rights are not dependent upon the actual reception by the defendant of its stock, he will be entitled to the value of his percentage of the stock at the time when the defendant· might have received it but for the contract of July 15, 1892. In connection with this subject, it may be added that we do not think the plaintiff, in any event, is entitled to 5 per cent. upon the first issue of increased stock. That was so issued as a dividend, in lieu or replacement of an equal amount of money earned by the Philadelphia company, and used in the expansion of the works or plant of the company. It was, in reality, earnings, or a substitute for earnings, belonging to the stockholders, who presumably agreed to take those earnings in that form, and was not new capital subscribed for as such. And that is evidently the only kind of increase of capital contemplated by the parties to this action in making the memorandum agreement.

The judgment should be reversed, and a new trial ordered, with costs to appellant to abide the event. All concur.

---

(10 App. Div. 30.)

LABOUISSE v. EVENING POST PUB. CO.

(Supreme Court, Appellate Division, First Department. November 6, 1896.)

LIBEL—MATTER AFFECTING ONE'S BUSINESS.

    It is not libelous per se, as affecting one's business as a cotton broker, to say that he was the leader of an attempt to corner the cotton market and dictate prices; that such an undertaking was a great menace to the trade; that it was an "utterly reckless undertaking," which it might be expected, and, in the interest of sound finance, might be hoped, would collapse,—there being no statement that he was not successful, nor that he was unskillful or dishonest. O'Brien and Williams, JJ., dissenting.

Appeal from special term, New York county.

Action by Peter Labouisse against the Evening Post Publishing Company for libel. From an interlocutory judgment sustaining a demurrer to the complaint, plaintiff appeals. Reversed.

Argued before VAN BRUNT, P. J., and WILLIAMS, PATTERSON, O'BRIEN, and INGRAHAM, JJ.

D. McClure, for appellant.

L. Godkin, for respondent.

PATTERSON, J.   The question we are called upon to decide is: Are the newspaper articles set forth in the complaint as defamatory of the plaintiff, libelous per se, and therefore presumptively false, and entitling the plaintiff to recover, without the allegation or proof of special damage?   It is not claimed that the articles referred to affect the personal character of the plaintiff, or are in disparagement of his general reputation; but it is claimed that, being published concerning him in a matter relating to his profession or trade, they are in and of themselves libelous and actionable.   The rule of law upon the subject must be regarded as well settled in this state since the case of Moore v. Francis, 121 N. Y. 199, 23 N. E. 1127, was decided; wherein it is held that, although no fraud or dishonesty is charged, words written or spoken tending to injure a man in his trade or occupation are actionable, and, unless the defendant lawfully excuses them, the injured party is entitled to recover without the allegation or proof of special damage.   It is unnecessary to multiply authorities upon that point.   It must be conceded in its widest scope. The question here is, therefore, whether or not these articles are so clear and unambiguous, admitting of but one interpretation and application, that the question of libel or no libel becomes one of law which the court must determine; or, in other words, whether we can adjudge, as matter of law, that the articles complained of necessarily and inevitably tended to injure the plaintiff in his business as a dealer, operator, or speculator in cotton, for, according to his own statement, he buys and sells cotton on his own account, and also as the agent for buyers and sellers, by which allegation is to be understood that he buys and sells both for himself and others in the market on the exchange in the ordinary way in which the operation of trading in cotton is carried on by cotton brokers and merchants engaged in that business.

The articles complained of appeared in a daily newspaper published by the defendant on the 17th of October, 1895; and part of the alleged defamatory matter was contained in one of the columns of the newspaper devoted to trade and business news, and was headed, "The Activity in Cotton."   It referred to the enormous character of the speculation in cotton had on that day, and to the efforts made by certain parties to enhance prices, to the plaintiff as being the leader of a bull movement, to an attempt of the plaintiff to corner the October option of the New Orleans market, and dictate the prices to American and English spinners, and force them to come into the market, and buy freely; and it stated that such an undertaking right in the middle of the harvest was a great menace to the trade.   The article then proceeded to state that, when the plaintiff started to bull cotton, he had no idea of seeing the price advance so rapidly or hanging on so long, but that his profits came so quickly and increased with such rapidity that he decided to make a campaign, and double his fortune, or lose everything in the attempt.   At the outset, he confined his operations to a few thousand bales per day, but now it

is said his daily transactions in New Orleans and Liverpool, and in this market combined, have of late frequently exceeded 50,000 bales. "It was only yesterday that a close friend of his in this market estimated his total paper profit at upward of $2,000,000. It may be more, and may be less, probably the latter; but it is quite an easy thing to buy up cotton or any other speculative commodity, and amass a fortune on paper, but it is not so easy to secure it." Now, it would seem to be quite clear that there is nothing defamatory in this publication, or that would in any way injuriously affect the plaintiff in his business, as affecting his credit or his capacity. There is nothing discreditable, unlawful, or disparaging to a man to say of him that he deals or speculates in cotton, since such transactions have been made lawful, and there can be no imputation upon the plaintiff in any way because of the magnitude of his transactions. Thus far it would seem that he was credited by the article with having so successfully and intelligently managed his enterprise that it resulted in an ostensible gain of $2,000,000. What follows in this particular article is not a charge or accusation against or imputation upon Mr. Labouisse in any way. It is merely a warning and a prophecy. It refers to what occurred to a Mr. Steenstrand, "who engineered the famous 'corner' in cotton during the season of 1889–90, and who was caught in just such a difficulty." A comparison is drawn between Mr. Steenstrand's situation and Mr. Labouisse, and all that is said with reference to Mr. Labouisse in this connection is, after stating the disaster that happened to Mr. Steenstrand: "This is just exactly what close students of the situation fear will be the result of the present wild speculation." How we can say, as matter of law, that these statements are libelous per se, that they must necessarily have caused damage to the plaintiff in his business, either by causing his particular adventure to fail, or in any other way, without knowing anything further about the operation or its results, it is difficult to see. We are asked judicially to decide that injury would necessarily result, and that the plaintiff would be entitled to a verdict for general damages simply upon the statement that has been above set forth.

But the complaint proceeds to state that in another article contained in the same newspaper, on the same day, in another column, under the head "Financial," there was published an account concerning the plaintiff, as follows:

"An utterly reckless undertaking, by a New Orleans speculator, to corner the cotton contract market, fixed in the middle of last week a price at which foreign spinners would not buy. The outward movement of cotton, normally heavy at this time, ceased abruptly, and the sterling market was instantly bare of bills. It may be expected, and, in the interest of sound finance, it may be hoped, that the Labouisse experiment will collapse."

There is nothing contained in this article charging the plaintiff with unskillfulness or want of capacity in his management of his particular business, or that which was intrusted to him by his clients. It is not alleged that the Labouisse experiment did collapse, or that he exhibited any incapacity in the transaction of the alleged effort to "corner" the cotton market. The effect of

his effort being such as to keep cotton spinners out of the market does not necessarily imply incapacity or unskillfulness, simply because one kind of buyers refrained from purchasing; and the effect upon the market for sterling exchange, as matter of law, cannot be adjudged as militating against the honesty, skill, or capacity of the plaintiff. All that remains of that particular article is that the plaintiff's speculation was called "an utterly reckless undertaking." But in the connection in which the words were used, and as applied to the subject of the article, it cannot be said that the law will conclusively presume that, unless justified, they must have affected the credit or the business of the plaintiff. He is not called in general a "reckless speculator." Only one transaction is so designated as reckless, and that may have been a great business success so far as he is concerned.

Again, it is claimed that in another column of the same newspaper, and on the same day, further defamatory matter was contained, in the following words:

"The trading in cotton to-day was again very heavy, and the fluctuations were violent enough to satisfy scalpers with the most pronounced view. Mr. Peter Labouisse, together with his bull clique, although a trifle disfigured from yesterday's violent break, were still in the ring, and they showed signs of life early in the day, by rallying to the support of the market. Mr. Labouisse and his friends in New Orleans tried to check the decline, by advancing prices in that market, but, as was the case yesterday, the tide was too strong for any one man or set of men to check it."

This does not charge unskillfulness or incapacity. On the contrary, it states that, notwithstanding the adverse situation and condition of things, Mr. Labouisse and his friends were still in control, and were still enabled to maintain their positions with reference to the operation they were carrying on, although the market was declining upon them.

Here, therefore, we have a case in which a man is conducting a large commercial enterprise, in the form of a speculation, the effects of which may be disastrous to trade generally, but, as affecting his own special calling and his own particular business, is one which, according to these articles, he was virtually successful in carrying on, although the writer of the article apprehended that, from the conditions disclosed, it would end in disaster. Upon the face of the articles, it is manifest that, so far as any deduction can be drawn respecting the position in which the plaintiff was placed, he was successfully continuing this transaction at the time these alleged libels were published. How is damage to his business to be presumed conclusively as a matter of law? Is it to be assumed that customers would be repelled from dealing with him merely because he was carrying on a gigantic transaction, in which he was meeting apparently with success? What a man is entitled to recover damages for in an action of libel, where his personal character and repute is not involved, is damage to his trade and business. The plaintiff is not charged with want of success, nor with unskillfulness, nor with incapacity, nor with dishonesty, but with boldness and apparently successful audacity.

We are therefore led to the conclusion that on the special facts of this case, and upon a just criticism of these articles, it may not be determined, as matter of law, that they are libelous per se; and that, if any cause of action is to be predicated on them, it can only be in connection with allegations and proof of special damage; and that the decision of the court below was right in sustaining the demurrer; and that the interlocutory judgment should be affirmed, with costs.

VAN BRUNT, P. J., and INGRAHAM, J., concur.

O'BRIEN, J. (dissenting). The plaintiff was not only engaged on his own account, but was acting as agent for others in the purchase of cotton. To say of such a man that he is engaged in "an utterly reckless undertaking," which is "a great menace to the trade," and which, it is prophesied, "will end in disaster," is not calculated to aid him, or to inspire with confidence those who might desire to employ him in the business of buying cotton. But, without regard to these characterizations of the articles complained of, we think their whole tenor was directly calculated to affect him injuriously in his trade or occupation, and therefore, under the authority of Moore v. Francis, 121 N. Y. 199, 23 N. E. 1127, were actionable per se; for, as therein said:

"Although no fraud or dishonesty is charged, words written or spoken tending to injure a man in his trade or occupation are actionable; and, unless the defendant lawfully excuses them, the injured party is entitled to recover, without the allegation or proof of special damages."

I think the allegation of special damage was not essential to the cause of action, and that the complaint was sufficient, and that the interlocutory judgment was erroneous, and should be reversed, with costs.

WILLIAMS, J., concurs.