In the Matter of CLEO G. REID, Respondent, *v.* WILBUR P. TRAMMELL, Appellant.

Fourth Department, October 19, 1961.

244

*Wilbur P. Trammell,* appellant in person.

*Emil Cohen* for respondent.

*Per Curiam.* The petitioner, as the candidate of the Republican party for the office of Councilman of the Ellicott District in the City of Buffalo, sought an order declaring null and void certain petitions filed by respondent as an independent candidate for the same office. The requested relief has been granted and respondent appeals.

It appears that Mr. Trammell is the present Councilman and was an unsuccessful candidate for nomination to that office in the Democratic primaries held on September 7. Shortly thereafter, respondent and a substantial number of his supporters met and commenced the circulation of petitions for his independent nomination. In the light of the present charges of fraud leveled against respondent it should be noted that each solicitor was given a mimeographed sheet of instructions for obtaining signatures of " registered voters." These instructions with considerable precision outlined a method of obtaining signatures by a house to house canvass.

Thereafter respondent caused a petition of some 148 sheets containing 2,206 signatures to be filed with the Board of Elections. The board found 1,349 of the signatures to be invalid, leaving 857 valid signatures. It is conceded that 615 signatures were required for this independent nomination. Thereupon the board found the petition qualified.

Special Term in invalidating the petition made no findings but wrote an opinion. The reasoning by which the court reached its ultimate conclusion is difficult to follow. Following a line by line examination of the petition the court found invalid 103 signatures that the board had validated. This reduced the number of valid signatures to 754 which, of course, exceeded the required number of 615. We adopt, without passing upon, the

findings of Special Term in voiding these 103 signatures in view of the patent error of the court in invalidating the remaining 754 signatures.

An understanding of such erroneous action requires a further consideration of the facts developed upon the hearing. Respondent's father was the pastor of a church located in the district in the City of Buffalo. According to his testimony, on Sunday, September 17, he permitted workers for his son to circulate the petitions among the congregation. At one point he testified that his estimate of the number of persons in the congregation was 800. Special Term erroneously seized upon this figure and wrote in its decision that 800 signatures were obtained by circulating the petitions among the congregation. Not only was there no evidence to sustain this finding but an examination of the petitions demonstrates the gross exaggeration. Assuming, in the absence of proof to the contrary, that all signatures made on September 17 were obtained in the church, we find a total of 331. Of this number 254 had been previously voided by the board, leaving 77 signatures not previously voided.

Special Term, however, reasoned that because the 754 remaining valid signatures were less " than the 800 signatures irregularly obtained " all of the 754 should be cast aside and the petition invalidated. This reasoning was obviously based on two inaccurate facts found by implication. First, that there were 800 persons in the congregation and all of them signed the petitions. Second, that none of the 800 signatures had been previously invalidated by the board. Actually, there were not 800 but at most 331 church signers, and, as stated, 254 of these had been previously thrown out by the board for other reasons. It follows that if the remaining 77 " church " signatures were discarded on any theory there would remain 677 valid signatures.

In passing we find no proof to sustain the findings of Special Term that " This procedure of obtaining the 800 signatures " in the church was done at the instance of respondent and with his knowledge. The proof upon the subject is the testimony of the father that he told his son to send some petitions so that the father could have his parishioners sign them.

This appears to have been the sole ground for the determination of Special Term. In the course of its opinion, however, the principle was enunciated and authorities cited that " When a candidate actively aids and participates in the presentation of a petition that is permeated with material irregularities, the entire petition is invalid, although containing sufficient valid signatures." We assume in the absence of other findings that

this principle was set forth as applicable to the church incident. If so, it had no pertinency in the light of our fact findings.

The record discloses that respondent had a substantial number of workers obtaining signatures. At the request of petitioner he produced six of these in court for examination. It must be admitted that the petitions contained a high percentage of invalid signatures. Approximately 70% of these invalidations, however, were upon the grounds that the signers were not registered in the word or district as set forth in the petition, or had voted in the September 7 primary.

We recognize the legal principle that where a candidate actively participates in the presentment of false or fraudulent petitions he is not allowed to benefit thereby. (Cf. *Matter of Weisberger* v. *Cohen,* 260 App. Div. 392; *Matter of Burns* [*Sullivan*], 199 Misc. 1005, affd. 278 App. Div. 1023, affd. 303 N. Y. 601; *Matter of Bloom* v. *Power,* 21 Misc 2d 885, affd. 9 A D 2d 626, affd. 6 N Y 2d 1001.) (See, however, *Matter of Lefkowitz* v. *Cohen,* 262 App. Div. 452, 454, affd. 286 N. Y. 499; *Matter of Johnson* v. *Westall,* 208 Misc. 360, affd. 286 App. Div. 966.) After a careful consideration of this record we find no proof to sustain a finding (if one had been made) that respondent participated in any false or fraudulent conduct in the preparation or submission of these petitions. He issued both oral and written instructions to his workers. He frankly concedes that many of the latter were persons of limited education, who may not have understood or carried out the instructions. He urges that he should not be penalized because chance has placed him in a position where his constituents and workers perhaps lack higher education and the sagacity to prepare petitions that are beyond criticism.

It is contended that the court's determination should be sustained because the number of irregularities in the petition vitiate all of the signatures whether genuine or not. Such a holding was overruled in *Matter of Lefkowitz* v. *Cohen* (262 App. Div. 452, 455, 456, affd. 286 N. Y. 499, 502, *supra*). In the Appellate Division it was said (p. 456): '' Where, as here, a petition containing the requisite number of signatures has been filed, the enrolled voters of a party should not be precluded from having the issue concerning the election of their designee determined by vote of the members of the party.'' The same reasoning applies with equal force to a group of registered voters who seek to elect an independent nominee.

The petitioner relies heavily upon *Matter of Bloom* v. *Power* (*supra*) and *Matter of Burns* (*Sullivan*) (*supra*) and argues therefrom that where there are numerous instances of misrep-

resentation and nothing is offered in rebuttal the court may indulge the presumption that there were other misrepresentations and invalidate all of the signatures. This legal principle should not be applied to the instant case. Persuasive in those decisions was the fact that the candidate had offered nothing in rebuttal. Here, however, most of the witnesses called at the hearing were produced in court by respondent. The latter has testified fully and frankly. As has been pointed out, the vast majority of signatures was invalidated because the signers were not registered or, if registered, had voted in the recent primary. There was no pattern of irregularity in the commonly accepted meaning of the word. The only proof of what might be termed irregularity related to the happenings at the church service. After all of the signatures thus obtained are discarded, however, there remain valid signatures well in excess of the required number.

Much is made by petitioner of the testimony of her two witnesses that on one occasion respondent stated that he knew 300 signatures on his petition were not " any good ". Respondent frankly admitted in his testimony that the careful check of his workers disclosed that certain signers of the petitions were not registered to vote at the last preceding election in the district and ward as set forth in the petition. Special Term made no finding on this subject but in our opinion this action was not so grievous as to bring about the complete invalidation of the petition and the thwarting of the wishes of more than 650 registered voters who seek to have the independent candidacy of respondent passed upon by all the voters.

We find that there were at least 677 valid signatures on respondent's petition and Special Term was not warranted in declaring the petition invalid.

The order appealed from should be reversed, the petition dismissed and respondent's application for an order directing the Board of Elections to place his name as a candidate for Councilman of Ellicott District upon the voting machines granted.

All concur. Present — WILLIAMS, P. J., BASTOW, GOLDMAN, McCLUSKY and HENRY, JJ.

Order unanimously reversed on the law and facts, without costs of this appeal to either party, petition dismissed without costs, and application of respondent, Wilbur P. Trammell, for an order directing the Board of Elections to place his name as a candidate for Councilman of Ellicott District upon the voting machines granted.