■ In the Matter of JILLIAN JONAS et al., Respondents-Appellants, v OTTO VELEZ et al., Respondents, and SEYMOUR FRIEDMAN, Respondent-Appellant-Respondent.—Judgment, Supreme Court, New York County (Martin Evans, J.), entered August 21, 1985, confirming a referee's report and invalidating the designating petition to place the name of Seymour Friedman on the ballot as a candidate for Manhattan Borough President in the Democratic primary election on September 10, 1985 and denying respondent candidate's cross motion to validate said petition, unanimously reversed on the law, without costs, and respondent's petition is deemed valid, and the Board of Elections is directed to place the name of Seymour Friedman on the ballot as a candidate.

Respondent-cross-petitioner candidate Friedman's designating petition has been found by Special Term to contain 4,861 valid signatures. While the line-by-line review by the referee, after extensive hearings, resulted in a finding of 5,100 valid signatures, the Justice at Special Term made factual findings, which we do not disturb, regarding the propriety of certain sheets submitted by three witnesses who testified which resulted in the disallowance of an additional 239 signatures.

Our focus is directed to other sheets containing some 757 signatures which were disallowed by reason of "uninitialed alterations".

It appears that the Friedman campaign retained, as is apparently more and more unfortunately becoming the accepted mode of operation, an independent agency, Penn-Schoen Associates, to gather, bind and file signatures for the campaign. The record discloses that the agency followed a procedure in many cases whereby the Election District (E.D.) and Assembly District (A.D.) information next to signatures was left blank by the person who obtained the signatures and remained so at the time the sheet was signed by the subscribing witness. At the time of the signing, however, the actual total number of such signatures was inserted in the appropriate space in the subscribing witness' statement. Thereafter, when the A.D.-E.D. information was added, there would be one or more signatures on a particular sheet for which no such data were available or applicable and such continued to be left blank. In a good-faith, albeit ill-advised, effort to have the number of signatures in the already executed subscribing witness' statement comport with the actual number of signatures on the sheet meeting the A.D.-E.D. requirements, a line was struck through the original number (which specified the actual total number of signatures on the sheet) and a lesser number was inserted reflecting the total number of signatures, having appropriate A.D.-E.D. information. These changes were not initialed by the original subscribing witness, and it is conceded that they were made by others in the course of the binding operation. The 757 otherwise valid signatures on the sheets where such changes were made were disallowed by both the Board of Elections and Special Term on the basis of an uninitialed alteration in the statement of a subscribing witness.

We recognize that such does constitute an alteration of the subscribing witness' statement. It is clear, however, that no fraud or misrepresentation was intended here as might well be the case in a situation where the space for the number of signatures is left blank by a subscribing witness and is thereafter filled in by another after the subscribing witness has signed the statement. Here the subscribing witness did fill in the actual total number of all signatures on the page while the subsequent patent alteration specified the number of eligible voters according to A.D.-E.D. designation. The information and procedures used were clear and evident and obviously not intended to mislead. The change was merely designed to conform to the facts.

Here, again, we are confronted with technical rules intended to prevent fraud in the petition-nominating process

which, when stringently applied, result in disenfranchising substantial numbers of voters for conduct for which they had no responsibility and which, as found by Special Term, was caused by an independent agency not under the direction or control of the candidate. (*See, Lefkowitz v Cohen,* 262 App Div 452, *affd* 286 NY 499, and *Matter of Franco v Velez,* 112 AD2d .)

When, as here, the candidate, after extensive challenges at both the Board of Elections and Special Term, has been found to have 4,861 signatures out of the necessary 5,000, the consequence of disallowing the otherwise valid signatures of voters seeking to exercise their rights to support a candidate in a primary election weighs particularly heavily.

The strength and integrity of the democratic process demand active involvement and participation by our citizens. Such involvement must be permitted and encouraged and not frustrated or thwarted by rigid and unswerving application of technicalities in a manner that does violence to the intended goal of the statute which defines those rules. Here the obvious mechanical change on the sheets was in no way designed to defraud, but on the contrary was an effort to make such sheets factually accurate by indicating the number of actually valid signatures on that page. While we make clear that we do not adopt or condone this practice, and would caution against its future use, we believe that allowing the signatures here in issue to be counted would be consistent with the salutary goal and ultimate purpose of our Election Law, which is to make the electorate the final arbiter of who shall hold public office. Concur—Carro, J. P., Bloom, Fein and Ellerin, JJ.